# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 17-1124V
Filed: February 22, 2021

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| GARY HELVIG, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | |
| v. | * | Finding of Facts; Ruling on Onset; |
| | * | Influenza ("Flu") Vaccine; |
| SECRETARY OF HEALTH | * | Shoulder Injury Related to |
| AND HUMAN SERVICES, | * | Vaccine Administration ("SIRVA") |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | | |

*Andrew Downing, Esq.,* Van Cott & Talamante, PLLC, Phoenix, AZ, for petitioner.
*Claudia Gangi, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## FINDING OF FACTS AND RULING ON ONSET[1]

**Roth**, Special Master:

On August 21, 2017, Gary Helvig ("Mr. Helvig" or "petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleged that he received an influenza ("flu") vaccine on October 22, 2015, and "[i]mmediately, he felt extreme pain at the injection site." *See* Petition ("Pet.") at ¶¶ 4-5. Petitioner further alleges that he suffered an on-Table Shoulder Injury Related to Vaccine Administration ("SIRVA") or, alternatively, that his injuries were caused-in-fact by the flu vaccine. *See id.* at ¶ 18.

---

[1] Although this Ruling has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

The only issue being addressed herein is the onset of petitioner's alleged left arm pain; petitioner alleges he experienced pain immediately after receiving the flu vaccine. The first documented report of left arm pain was three months after his vaccination on January 14, 2016, when petitioner presented for medical care and reported left deltoid pain that began three months before, after he received a flu shot on October 22, 2015.

For the reasons outlined below, I find that preponderant evidence supports the onset of petitioner's left arm pain after November 20, 2015.

## I. Background

**A.    Procedural History**

Petitioner filed a petition for compensation on August 21, 2017, which was initially assigned to the Special Processing Unit ("SPU"). *See* Pet., ECF No. 1; SPU Initial Order, ECF No. 8. On August 23, 2017, petitioner filed his affidavit, immunization record, and medical records from the Veterans Affairs ("VA") Portland Health Care System. *See* Petitioner's Exhibits ("Pet. Ex.") 1-5, ECF No. 5.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on June 13, 2018, recommending against compensation and requesting the petition be dismissed. ECF No. 20. Respondent pointed to petitioner's first complaint of shoulder pain nearly three months after his flu vaccination. Resp. Rpt. at 6. Further, respondent postured that petitioner did not suffer from an on-Table SIRVA because his vaccine was given in his lower deltoid and petitioner experienced no limitation in his range of motion. *Id.* at 7. Moreover, petitioner had "another 'condition or abnormality'," specifically a tumor in his left humerus, in the area of his pain and thus an identified alternate cause. *Id.* at 7-8.

This matter was reassigned to me on September 20, 2018. ECF Nos. 21-22. A status conference was held on November 27, 2018 to discuss the issues in the record, which included inconsistencies between petitioner's affidavit and the medical records, the alleged date of onset, and whether petitioner's pain was in his arm or shoulder. Scheduling Order at 3, ECF No. 23. Petitioner was ordered to file updated medical records and did so on February 12, 2019. *Id.*; Pet. Ex. 4, ECF No. 25.

The parties were encouraged to discuss an informal resolution but were ultimately unsuccessful. *See* Non-PDF Order, issued Apr. 30, 2019; Pet. S.R., ECF No. 31; Resp. S.R., ECF No. 32. Respondent requested a finding of fact regarding the onset of petitioner's alleged shoulder pain before the parties proceeded to expert reports. Resp. S.R. at 2, ECF No. 33.

Petitioner filed a status report on November 14, 2019, advising that he wished to "proceed with a fact hearing based on the record." Pet. S.R. at 1, ECF No. 34. After a request for clarification, petitioner's counsel confirmed via email that petitioner preferred a fact *ruling* as to onset based on the record. *See* Scheduling Order at 1, ECF No. 35. Petitioner did not request a hearing.

On January 14, 2020, petitioner filed a Motion for Ruling on the Record ("Motion"). ECF No. 36. Respondent filed a response ("Response") on February 11, 2020 to petitioner's Motion. ECF No. 38. Petitioner filed a reply ("Reply") on March 9, 2020. ECF No. 40.

This matter of onset is now ripe for determination.

**B.     Summary of Medical Records Related to Onset**

Petitioner received all of his medical care from various departments at the VA Portland Health Care System ("the VA"). On October 22, 2015, petitioner received the allegedly causal flu vaccination in his left deltoid. Pet. Ex. 2 at 1. At that time, petitioner had a number of significant medical issues, including but not limited to, vitamin B12 deficiency, hypothyroidism, peripheral polyneuropathy, chronic lower back pain, chronic obstructive pulmonary disease/emphysema ("COPD"), and colon polyps. Pet. Ex. 3 at 55, 56, 124-25, 127-28, 141, 305, 317. Additionally, petitioner had previously experienced inflammation and sore muscle at the injection site with testosterone injections; subsequently, his medical records noted "Allergies: Testosterone Cypionate Injection." *Id*. at 57, 96, 143-44, 372, 374.

Petitioner's next contact with a medical provider following his flu vaccine on October 22, 2015 was on November 18, 2015, when he telephoned the VA Call Center to request his lab results. Pet. Ex. 3 at 292. Petitioner expressed concerns during that phone call that his hypothyroidism medication was potentially not working. *Id*. No other complaints were noted.

On November 20, 2015, petitioner presented as a walk-in patient to the primary care nursing department at the VA. Pet. Ex. 3 at 290. Petitioner complained that his "legs and arms feels (sic) cold all the time, in a bad mood all the time and feeling tired all the time." *Id*. He believed his thyroid medication, levothyroxine, was not working because he had similar symptoms about ten years ago before starting levothyroxine. *Id*. at 290-91. Petitioner had a thyroid test, which was normal, and no change was made in his thyroid medication. *Id*. at 289. There were no complaints of arm or shoulder pain documented in the record for this visit.

On January 14, 2016, petitioner presented to his primary care provider, Nurse Practitioner ("NP") Lampert, for "left deltoid pain." Pet. Ex. 3 at 282. Petitioner reported receiving a flu vaccine "into the left lower deltoid" on October 22, 2015, with "localized injection site pain ever since." *Id*. The pain varied from 3/10 to 7/10 and was worse at night while lying on his left side. *Id*. He had no recent injuries to his left shoulder. *Id*. NP Lampert noted that petitioner expressed concerns for "prolonged discomfort. . . by internet review he tells me that this can last up to 1 year." *Id*. Upon examination, NP Lampert noted no inflammation, no irritation, no redness, no local reaction, and no hematoma. *Id*. Petitioner's range of motion in both arms, "especially at the shoulders, [was] full and intact with both internal and external rotation preserved." *Id*. NP Lampert noted that axial pressure on the neck produced slight tingling into the left shoulder region. *Id*. He was concerned for possible nerve disruption based on petitioner's description of pain "more as a stabbing versus a tingling or burning pain." *Id*. at 283. Petitioner was prescribed gabapentin and a topical analgesic balm for pain. Shoulder and cervical spine x-rays were ordered. *Id*. at 282-83.

X-rays of the cervical spine revealed moderate degenerative disc disease at C5-6 and C6-

3

7 associated with kyphosis of the thoracic spine at that level and mild to moderate facet degenerative changes, significantly worse on the right than the left. Pet. Ex. 3 at 280-81. Left shoulder x-rays showed no evidence of fracture or dislocation but mild degenerative arthrosis of the acromioclavicular and glenohumeral joints and an infarction of the proximal diaphysis of the left humerus.[3] *Id*. at 281. On January 20, 2016, an orthopedic physician reviewed petitioner's x-rays and concluded that the calcifications in the left humerus indicated the infarction was old: "old means years ago. It has no relation to current complaints or vaccination." *Id*. at 280.

In March of 2016, petitioner had multiple medical visits for abdominal pain, which ultimately lead to an endovascular stent procedure on April 25, 2016. *See* Pet. Ex. 3 at 257 (Report by petitioner that he presented to the ER at Roseburg VA on February 29, 2016[4] for abdominal pain), 278-79 (March 4, 2016 phone call to the VA advice nurse for abdominal pain, poor appetite, and lack of bowel movements), 257-77 (March 5, 2016 presentation to the ER for six days of abdominal pain and constipation), 239-53 (March 11, 2016 presentation to the ER for ongoing abdominal pain), 223-36 (March 28, 2016 pre-operation appointment); *id*. at 209-221 (April 25, 2016 endovascular stent procedure), 185-89 (April 26, 2016 discharge from VA hospital). Petitioner subsequently attended several follow-up appointments for care related to his surgery. *Id*. at 180-82 (May 5, 2016 urology follow-up), 178-79 (May 6, 2016 vascular follow-up), 177-78 (June 2, 2016 urology follow-up), 167-68 (August 26, 2016 vascular follow-up), 165 (September 27, 2016 urology telephone follow-up), 503 (April 28, 2017 vascular follow-up).

Petitioner did not seek any care for his alleged left arm pain during the spring of 2016. However, petitioner reported during his March 11, 2016 ER visit that he was no longer taking gabapentin for left deltoid pain. Pet. Ex. 3 at 252; *see also id*. at 216 (April 25, 2016 record indicating that petitioner was no longer taking gabapentin). At his March 28, 2016 pre-op appointment, petitioner reported that he was not taking any narcotics or pain medication of any type. *Id*. at 232. The record for this visit notes that petitioner "[r]eports neck and lower back pain. He has had left upper arm pain since receiving a flu shot this fall." *Id*. at 236. A "Surgery Preop Assessment" taken the same day documents "[b]ased on patient report and nurse observation" and interview; petitioner has "no musculoskeletal or joint abnormalities. No limitation of mobility, moves all extremities, normal gait." *Id*. at 225. At his May 6, 2016 vascular follow-up, petitioner was noted to be "doing well and back to work. [N]o complaints." *Id*. at 178.

On June 3, 2016, petitioner saw his primary care provider for a routine check-up of his chronic medical conditions, including his thyroid and recent surgery. Petitioner reported "left upper shoulder/deltoid pain from his prior flu shot which was received in 2015. It has been bothersome ever since he had the injection." Pet. Ex. 3 at 169. No treatment, assessment, or plan was noted for petitioner's shoulder pain. *See id*. at 168. NP Lampert documented that petitioner was no longer taking gabapentin. *Id*. at 174. Petitioner declined a pneumococcal polysaccharide vaccine (Pneumovax). *Id*. at 176.

---

[3] A bone infarction is an area of bone tissue that has become necrotic as a result of a loss of its blood supply. *Bone infarction*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 922 (33d ed. 2020) [hereinafter "DORLAND'S"]. The humerus is the long bone in the arm that connects the shoulder and the elbow. *Humerus*, *id*. at 863.

[4] No medical records documenting this visit were filed.

4

There was no further care for his shoulder until November 30, 2016, when petitioner called the VA to request a referral to an orthopedist. Pet. Ex. 3 at 164. Thereafter, on December 29, 2016, petitioner presented to NP Lampert for a routine check-up. *Id*. at 153. Petitioner reported continued "left lateral deltoid pain, which he thought was brought on by his flu immunization in October of 2015" and "that he may be filing a claim for ongoing left shoulder/deltoid pain." *Id*. NP Lampert noted that a topical analgesic balm and gabapentin had been tried "without success, as we suspected that this may be neuropathic pain." *Id*. A musculoskeletal assessment documented "pain with raising his left arm above shoulder height." *Id*. NP Lampert suspected impingement, requested a consult from orthopedics and prescribed topical lidocaine cream. *Id*. at 154.

On February 13, 2017, petitioner consulted with Dr. Berkson, an orthopedic for left shoulder pain. Pet. Ex. 3 at 150. Petitioner reported left lateral deltoid pain "ever since flu shot October 2015." *Id*. He had tried physical therapy, topical medication, and massage without relief. *Id*. Upon examination, petitioner had tenderness at the lateral deltoid "right where I got my injection" and 5/5 strength. *Id*. at 151. Dr. Berkson "explained that shoulder pain is quite common at his age," but the "time line (sic) and location for his pain does suggest that it is a side effect of the flu shot." *Id*. at 152. Dr. Berkson ordered an MRI of the shoulder to evaluate for rotator cuff pathology and an MRI of the humerus to evaluate the potential bone infarct. *Id*.

On March 13, 2017, petitioner had MRIs of his left shoulder and humerus, which revealed a six cm chondroid lesion with mild endosteal scalloping in the proximal diaphysis of the humerus with localized pain, raising concern for chondrosarcoma.[5] Pet. Ex. 3 at 148-50. Petitioner was scheduled for a follow-up with ortho-oncology. *Id*. at 152.

On March 17, 2017, petitioner presented to Dr. Gundle, an orthopedic surgeon. He reported "intermittent pain" in his left shoulder that "feels like the needle is still stabbing into his skin." Pet. Ex. 3 at 147. The pain was worse with touch or pressure and overhead motions. *Id*. The differential diagnoses included enchondroma[6] and grade one or two chondrosarcoma, but a biopsy was needed to reach a definitive diagnosis. *Id*. An addendum following the appointment noted that the tenderness "seems most attributable to the lesion, though some chronic pain after a flu shot is possible though not likely." *Id*. at 148. An x-ray was performed which showed that the chondroid lesion in the proximal humeral shaft was "not significantly changed" when compared with radiographs taken on January 14, 2016. *Id*. at 22, 507.

A CT scan of petitioner's abdomen and pelvis was performed on April 6, 2017, as part of the follow-up care after his surgery. Pet. Ex. 3 at 504-05. Additionally, another x-ray was taken of petitioner's left humerus to investigate tumor progression. *Id*. at 506. The x-ray showed a chondroid lesion in the proximal humeral diaphysis, unchanged from the x-ray taken March 17, 2017. *Id*.

On May 5, 2017, petitioner had a pre-operation assessment for left humerus biopsy. Pet. Ex. 3 at 546. Petitioner reported left shoulder pain score of four, with pain especially with

---

[5] Chondrosarcoma is a malignant tumor that occurs in the pelvis, femur, and shoulder girdle in middle-aged to older adults. *Chondrosarcoma*, DORLAND'S at 348.

[6] An enchondroma is a benign growth of cartilage arising in a bone. *Enchondroma*, DORLAND'S at 609.

5

abduction. *Id*. at 548, 550.

On May 22, 2017, petitioner underwent open bone biopsy and tumor removal. Pet. Ex. 3 at 502, 536-46, 552. The biopsy results revealed a low grade chondroid neoplasm and uniform low cellularity favoring an enchondroma. *Id*. at 516-17. The surgeon and petitioner agreed that the surgical procedure was indicated. *Id*. at 519. That same day, petitioner underwent curettage[7] of the left humerus with placement of antibiotic cement. *Id*.

On June 2, 2017, petitioner had a post-operative follow-up. Pet. Ex. 3 at 534. He was doing well, his left shoulder was still sore, but he denied numbness in the deltoid or hand. *Id*. His incision was healing well, sensation over the deltoid was intact, and he had 5/5 strength with shoulder abduction. *Id*. The orthopedic surgeon "discussed with patient good news of his benign lesion. . . [the] pain should quiet down with removal of the tumor although there may be a muscular component at the deltoid attachment contributing to the pain." *Id*. at 535. Petitioner had "no range of motion restrictions." *Id*. A six-week follow-up with imaging was suggested for revaluation and to check on pain improvement. *Id*.

On June 7, 2017, petitioner presented to NP Lampert for a routine follow-up. Pet. Ex. 3 at 525. Petitioner reported that his thyroid medicine was stolen from his mailbox, but he had a three-day supply of levothyroxine. *Id*. NP Lampert noted "there are possibly 2 distinct sites" regarding petitioner's left arm pain, the left lateral deltoid and the left shoulder. *Id*. Additionally, a flu shot in October 2015 "has persisted to cause him left lateral deltoid pain" and "[t]he workup for shoulder pain" led to an orthopedic evaluation and biopsy for an enchondroma. *Id*. However, petitioner's shoulder pain has "mostly resolved." *Id*. at 526. In the "Patient Entered Medication Review" for that visit, petitioner noted he was not using lidocaine pain cream or any pain medication. Pet. Ex. 4 at 96.

Petitioner had no medical care between June 13, 2017 and April 17, 2018 but did contact the VA on several occasions. *See, e.g.*, Pet. Ex. 4 at 43-44, 89 (telephone call to patient services on June 20, 2017 for a refill of levothyroxine), *id*. at 88 (telephone calls on October 25 and 26, 2017 regarding scheduling a vascular follow-up), *id*. at 85-86 (telephone call on March 16, 2018 to schedule a primary care appointment for right shoulder pain), *id*. at 84-85 (telephone call on April 10, 2018 to discuss scheduling labs).

Petitioner next presented for medical care on April 17, 2018 with complaints of right shoulder pain for two to three months which was worse with movement. Pet. Ex. 4 at 1, 75. Petitioner denied left shoulder pain and no limitation in range of motion was found. *Id*. at 75, 77. X-rays were taken of both shoulders on that day. X-rays of his right shoulder showed no definite explanation—no degenerative changes in joints or soft tissue calcifications. *Id*. at 19. He was prescribed diclofenac gel and scheduled for physical therapy evaluation for his right shoulder pain. *Id*. at 34, 71. X-rays taken of his left shoulder showed no abnormalities—the previously seen chondroid lesion was no longer present. *Id*. at 18.

---

[7] Curettage is the removal of growths or other material from the wall of a cavity or other surface. *Curettage*, DORLAND'S at 442.

6

C.     **Petitioner's Affidavit**

Petitioner filed an affidavit on August 21, 2017. Pet. Ex. 1. Petitioner affirmed prior to vaccination, he "was in excellent health and very active." Pet. Ex. 1 at ¶ 2. He hiked three to five miles every day and "rarely sat during the day." *Id*. He was also "an avid gardener, spending hours tilling soil, propagating plants, and clearing brush to make new gardening area[s]." *Id*. He also enjoyed mountain climbing, dancing, yoga, golf, and home repair. *Id*. Petitioner was the owner and operator of a window cleaning business for twenty years. *Id*. at ¶ 3. Although it was "very physically demanding work," it "never presented any problems" for petitioner because he "was in such good shape." *Id*. He "rarely experienced pain before, during, or after cleaning windows, and he did "it was minor muscle pain which diminished quickly." *Id*.

Petitioner affirmed receipt of the subject flu vaccine on October 22, 2015 at the VA medical clinic in Salem, Oregon. Pet. Ex. 1 at ¶ 4. According to petitioner, "The shot was jabbed into my arm with extreme force. Immediately, I felt extreme pain at the injection site, even yelling my displeasure." *Id*. at ¶¶ 4-5. He "left the VA clinic that day experiencing extreme pain at the injection site. . . the best description of the pain. . . is that it feels like the needle broke off in my arm and the area became infected." *Id*. at ¶ 6.

Petitioner affirmed, "After 4 weeks of 24/7 pain, I couldn't take it anymore. On November 20, 2016 (sic) I walked into the Salem VA clinic, hoping to see my primary care provider and discover the source of the pain." Pet. Ex. 1 at ¶ 7. Petitioner affirmed that the VA system does not allow for walk-in appointments; his "unannounced visit brought the wrath of [his] primary care provider" who was displeased but ultimately "prescribed an ointment and Gabapentin for pain, neither of which worked to reduce the pain." *Id.* Petitioner did not describe any efforts to make an appointment between his receipt of the flu vaccine on October 22 and his walk-in presentation on November 20.

According to petitioner, after the walk-in visit, he made a formal appointment with his primary care provider.[8] Pet. Ex. 1 at ¶ 8. Prior to his appointment, petitioner "researched online and found that there were a lot of people who had suffered ongoing pain at the injection site of flu shots." *Id*. Petitioner mentioned these concerns to his primary care provider; X-rays were ordered and showed no fracture or dislocation in the arm. *Id*. When petitioner asked what was causing the pain, his primary care provider said he did not know. *Id*.

Petitioner conceded there was a time between March 2016 and June 2016 "when the arm pain was less invasive in [his] life, but that was because [he] was diagnosed with an aneurysm, which was accompanied by severe abdominal pain." Pet. Ex. 1 at ¶ 10. "But once I healed from that, the arm pain reared its ugly head, producing significant pain 24/7." *Id*.

Petitioner affirmed that he scheduled an appointment with his primary care provider for June 2016, who "said there was nothing the VA could do about the pain." Pet. Ex. 1 at ¶ 11. Petitioner made another appointment with his PCP; he was prescribed "topical pain crème with

---

[8] Petitioner did not state when the appointment occurred in his affidavit; however, based on the medical records, it is presumed that petitioner is referring to his January 14, 2016 appointment.

7

lidocaine" and referred to an orthopedic specialist. *Id*. Petitioner schedule an appointment with the orthopedic specialist. *Id*.

Petitioner affirmed that he filed a VAERS report on December 23, 2016[9] and "followed up in January 2017 detailing [his] present pain level." Pet. Ex. 1 at ¶ 18.

Petitioner affirmed he experiences pain "24/7" that increases significantly whenever he does "anything except remain still." Pet. Ex. 1 at ¶ 14. "Any movement of my left arm results in an immediate pain spike." *Id*. Petitioner "had planned to continue cleaning windows until March 2024," when he will become eligible for full Social Security benefits, but "cannot do it because of the pain." Pet. Ex. 1 at ¶ 10. Instead, he entered into a deal to sell his business in 2017. *Id*.

Petitioner's affidavit was signed and dated on August 21, 2017, the same day of filing.

**D.     Parties' Arguments**

In his moving papers, petitioner argues that his "shoulder symptoms manifested almost immediately after receiving the influenza vaccine" on October 22, 2015. Motion at 1. In support of his argument, he refers to medical records from visits in which he reported onset of symptoms following the flu vaccine. Specifically, petitioner points to his first visit for left shoulder pain on January 14, 2016 where he reported pain since receiving the flu vaccine. *Id*. at 3, citing Pet. Ex. 3 at 286 ("(L) shoulder [p]ain constant with exacerbation with movement of shoulder x 2 months – since receiving flu vaccine"). He then pointed to subsequent appointments where he reported left upper arm pain since receiving a flu vaccine on March 28, 2016 ("left upper arm pain since receiving a flu shot this fall"); June 6, 2016 ("left upper shoulder/deltoid pain" since a flu shot received in 2015); and December 29, 2016 ("complaint of left lateral deltoid pain. . . brought on by his flu immunization in October of 2015"). *Id*. at 3-4, citing Pet. Ex. 3 at 116, 153, 169, 236. Petitioner asserts these contemporaneous medical records document the onset of symptoms after vaccination. Reply at 3, citing *Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (quoting *Clark v. Sec'y of Health & Human Servs*., No. 90-45V, slip op. at 3, 1991 WL 57051 (Cl. Ct. Spec. Mstr. Mar. 28, 1991)) *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992).

In addressing his medical records of November 18, 2015 and November 20, 2015, which were after the alleged vaccination but silent with regard to any arm or shoulder pain, petitioner submits the November 18, 2015 phone call was for his thyroid medication, a condition "completely unrelated to a shoulder injury", therefore it is "unsurprising that [petitioner] would not make shoulder complaints on this phone call." Reply at 1.  However, petitioner claims he *did* discuss his shoulder pain at his November 20, 2015 medical visit but the medical records do not reflect this. *Id*. at 2. For this reason, petitioner asserts that the "absence of a reference to specific symptoms in medical records does not conclusively establish the absence of symptoms during that time frame." *Id*.

---

[9] A VAERS report has not been filed into the record in this matter.

Respondent argues that petitioner "failed to produce any, let alone preponderant, reliable evidence that his symptoms began within 48 hours of his receipt of the flu vaccine on October 22, 2015." Response at 9. More specifically, respondent submits petitioner's onset claim is "not reliable or accurate," because although petitioner's "first report of left deltoid pain. . .on January 14, 2016" related his pain to the flu vaccine, petitioner failed to address medical records created on November 18 and 20, 2015 that are silent regarding left shoulder pain. *Id*. at 8. Respondent argues that the November medical records are crucial to establishing onset as they fall between the date of vaccination, October 22, 2015, and the first documented report of shoulder pain on January 14, 2016. *Id*. at 9. Respondent also points to other inconsistencies between petitioner's affidavit and the contemporaneous medical records asserting those contradictions "suggest that [petitioner's] recollection is less than reliable." *Id*.

## II. Discussion

### A. Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing his claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), *vacated on other grounds*, 809 F. App'x 843 (Fed. Cir. 2020); *Cucuras v. Sec'y of Health & Human Servs.,* 26 Cl. Ct. 537, 543 (1992), *aff'd,* 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id.* A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy*, 23 Cl. Ct. at 733 (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier

9

contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.* Similarly, contemporaneous medical records may be considered more persuasive than a petitioner's affidavit created years after the fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes).

In order to overcome the presumption of accuracy afford to contemporaneous medical records, witness testimony must be "consistent, clear, cogent and compelling." *Sanchez*, 2013 WL 1880825, at *3 (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)). However, a special master cannot make a finding of fact based on witness testimony alone; the testimony must have some form of corroborating evidence. *See Epstein v. Sec'y of Health & Human Servs.*, 35 Fed. Cl. 467, 468 (1996) ("In cases in which a court has based a finding upon lay testimony, there must be corroborating evidence, either medical or otherwise, to support the claim").

### B. Determination of Onset

For the reasons outlined below, I find that there is preponderant evidence that the onset of petitioner's left arm pain occurred after his November 20, 2015 medical visit.

Petitioner argues his left arm pain began on the day he received his flu vaccine, but this claim finds no persuasive support in the record. Petitioner's first documented complaint of left deltoid pain was on January 14, 2016. Between the date of his vaccination, October 22, 2015, and January 14, 2016, petitioner contacted the VA to request lab work due to his concern that his thyroid medication was not working. *See* Pet. Ex. 3 at 292 (documenting telephone call on November 18, 2015). He then presented to the walk-in clinic on November 20, 2015, and further complained of symptoms he attributed to his thyroid medication. *See* Pet. Ex. 3 at 290-91. The records for this visit do not reflect any complaint of left arm pain, and there was no record of any treatment for left arm pain or medication prescribed for left arm pain.

Petitioner claims that he complained of left arm pain on November 20, 2015, but it was not documented. He affirmed that his presentation as a walk-in patient "brought the wrath" of his primary care provider, but the record for this visit does not in any way reflect this or indicate that walk-in presentations were prohibited or inappropriate. *See* Pet. Ex. 1 at ¶ 7; Pet. Ex. 3 at 290. Moreover, it unclear why petitioner waited four weeks after his vaccination to seek medical care when he was suffering from intense pain, as he stated in his affidavit. If petitioner tried to make an appointment during this four-week period, such attempts are not reflected in the VA records. The record of his telephone call on November 18, 2015, regarding his thyroid medication does not note any complaints of arm pain or any attempts to schedule an appointment for arm pain. *See* Pet. Ex. 3 at 292. Notably, the records do reflect many of petitioner's other calls to schedule appointments. *See, e.g.*, Pet. Ex. 3 at 121 (calls on August 14 and 15, 2013, to schedule an ultrasound), 161-63 (series of calls between December 15 and 19, 2016 to schedule an appointment), 166 (call on September 23, 2016 to schedule a urology appointment), 237-38 (series of calls between March 21 and 24, 2016 to schedule a urology appointment), 300 (call on May 4,

2015 to reschedule an appointment for lab work), 313 (call on March 14, 2014 to reschedule an appointment), 317 (call on August 21, 2013 to schedule an appointment).

Petitioner's medical records reflect that he was vigilant with his health care and always presented for medical care when in pain, as he did on multiple occasions in the spring of 2016 when he was suffering from abdominal pain. *See, e.g.*, Pet. Ex. 3 at 239-53, 257-77. However, petitioner did not present for any medical care for his left arm pain for three months, until his January 2016 visit with his primary care provider, despite his affirmance that the pain was as though "the needle broke off and became infected." *See* Pet. Ex. 1 at ¶ 6. This is particularly confusing in light of petitioner's prior history of injection site reaction to testosterone injections for which he required, sought, and received prompt medical care. *See* Pet. Ex. 3 at 57 (Noting an allergy to testosterone shots causing muscle pain and injection site pain), 96 (medical record noting "Allergies: testerone (sic) cypionate injection"), 142-44 (October 2, 2012 order replacing petitioner's prescription for testosterone injections with topical androgel after petitioner "experienced a significant adverse reaction"), 372-74 (Primary care appointment on October 1, 2012 noting that petitioner reported "[h]is testosterone injections are causing him to have an inflamed area at the site of injection and sore muscle on the side of the hip every month where it has been given").

Still further, petitioner claims he was prescribed gabapentin and topical ointment for his arm pain at the November 20, 2015 appointment, yet the record does not document these medications being prescribed. Thus, petitioner is claiming that not only did NP Lambert fail to document his complaints of left arm pain from the flu vaccine on that date, but also that he failed to document prescribed medications. Notably, the record for January 14, 2016, documents left arm pain and prescriptions for gabapentin and a topical analgesic cream. It is therefore more probable that petitioner conflated the events of the November 20, 2015 visit with the January 14, 2016 visit, rather than the medical provider failing to record both a complaint of intense left arm pain and the medication prescribed to treat said complaint. Absent from petitioner's affirmations is any information and/or evidence of ongoing pain and/or disability between November 20, 2015 and January 14, 2016.

Petitioner argues that the absence of a reference to his shoulder pain does not establish an absence of symptoms, quoting *Murphy*—"the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance"—to support his contention that the absence of any reference of shoulder pain in the record on November 20 does not automatically confer an absence of symptoms. This quote was referenced by the Court of Federal Claims in reviewing the special master's decision in that case along with the "standard for weighing medical records and personal accounts" used in the special master's decision. 23 Cl. Ct. at 733, citing *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 74931, at *4 (Cl. Ct. Spec. Mstr. Apr. 25, 1991). The Court in *Murphy* did not ascribe any particular significance to the statement cited by petitioner but rather determined overall that the standard used by the special master was reasonable. The petitioners therein alleged that their minor child "displayed symptoms of an encephalopathy" within eight hours of vaccination, but the medical records documented an onset of symptoms seven days after vaccination. 1991 WL 74391 at *2, 5. The special master afforded more weight to the contemporaneous medical records than the petitioners' affidavits. Succinctly, although the special master in *Murphy* recited the

statement relied upon by petitioner, he came to the opposite conclusion. Therefore, here one could say that based on the evidence in the record, petitioner did not in fact suffer from left arm pain until sometime after his November 20, 2015 visit and shortly before he presented for the January 14, 2016 visit at which time he complained of and was treated for left arm pain for the first time. Petitioner's use of the citation is unpersuasive.

Respondent submits that petitioner is a poor historian, as evidenced by the inconsistencies between his own recollection and his medical records. *See* Response at 9. As examples, petitioner stated in his affidavit that the VA does not allow walk-in appointments, but he was seen at the VA on November 20 as a walk-in patient. *See* Pet. Ex. 1 at 2; Pet. Ex. 3 at 290. Petitioner reported to Dr. Berkson on February 13, 2017 that he had tried physical therapy, massage, and topical medication for his shoulder pain, yet none of petitioner's records indicate that he sought or received any physical therapy or massage therapy. *See* Pet. Ex. 3 at 150. These inconsistencies, when combined with petitioner's apparent confusion about his November 20, 2015 and January 14, 2016 visit, support respondent's assertion that petitioner's recollection is unreliable. Petitioner's affidavit does not rise to level of "consistent, clear, cogent and compelling" to overcome the presumption of accuracy afforded to contemporaneous medical records, particularly since it contradicts the medical records. Petitioner has provided nothing that would support his account over the medical records. Petitioner's word alone is not sufficient to evidence to overcome the presumption of accuracy of the contemporaneous medical records.

Since this ruling is limited to onset only, it is unnecessary to discuss in detail further the findings upon objective testing of the alternative cause of petitioner's left arm pain. For the purposes of this ruling, there is a lack of preponderant evidence to support a finding that petitioner experienced any unusual or unexpected pain in his left arm upon receipt of, or immediately after his vaccination. According to the contemporaneous medical records, petitioner did not complain of his arm pain at his November 20, 2015 visit and was not treated for or prescribed any medication for left arm pain at that time. Petitioner did complain of deltoid pain at the location of his flu vaccine at his January 14, 2016 visit at which time he provided an onset of history of "(L) shoulder [p]ain constant with exacerbation with movement of shoulder x 2 months – since receiving flu vaccine", placing onset in November of 2015. Pet. Ex. 3 at 286. It logically follows that the onset of his arm pain was at some point after the November 20, 2015 at least a month after his flu vaccine.

### III. Conclusion

For all the foregoing reasons, I find that preponderant evidence supports an onset of petitioner's left shoulder/deltoid pain after November 20, 2015.

Petitioner has 90 days to file an expert report which relies on the facts as found in this Ruling and complies with the *Althen* criteria. Should petitioner's expert base his opinion on facts as found by this Ruling, or the expert's report will be disregarded. *See Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

Accordingly, the following is ORDERED:

**By Thursday, April 8, 2021, petitioner shall file either an expert report that is based on the onset as found herein, or a status report indicating how he intends to proceed.** Petitioner shall provide a copy of this Onset Ruling to each of his expert witnesses, and his expert(s) shall rely on the timing of onset as I have found it in this Ruling. If petitioner is unable to secure reports from his expert(s) based on the timing of onset as I have found it, he shall file either a motion to dismiss, a joint stipulation for dismissal, or a motion for a ruling on the record, all of which will result in the dismissal of his claim.

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master